**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **ERIC SIM,** | **Civil Action No.:** |
| **Plaintiff,** | **COMPLAINT** |
| **v.** | |
| **CITY OF HOUSTON, KATELYN HOWTON, in her individual capacity, KIRSTEN KORYCIAK, in her individual capacity, SOOYOUN CHO, ALEJANDRA ESPITIA, MIA MOREY, and MADELYNN CAMPBELL,** | **Jury Trial Demanded** |
| **Defendants.** | |

PLAINTIFF ERIC SIM, by his attorneys Nelson S. Ebaugh, P.C., and Offit Kurman, P.A., as and for his Complaint against Defendants CITY OF HOUSTON, KATELYN HOWTON, KIRSTEN KORYCIAK, SOOYOUN CHO, ALEJANDRA ESPITIA, MIA MOREY, and MADELYNN CAMPBELL, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff Eric Sim ("Sim" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 to redress deprivations, under color of state law, of rights secured by the Fourth and Fourteenth Amendments.

2.      In violation of the Fourth and Fourteenth Amendments of the Constitution of the United States of America, Defendants the City of Houston, Katelyn Howton, and Kirsten Koryciak subjected Sim to a false arrest, a malicious prosecution, and violations of his substantive due process rights.

3.      Defendants Sooyoun Cho, Alejandra Espitia, and Mia Morey procured a malicious prosecution against Sim and, along with Defendant Madelynn Campbell, engaged in a conspiracy

1

to subject Sim to a malicious prosecution.

4.    As detailed more extensively below, Defendants engaged in a year-long abuse of the criminal justice system that severely damaged the credibility of true victims of sexual violence.

5.    Cho, Espitia, and Morey were adults who willfully consented to engaging in sexual intercourse with Sim.

6.    They all knew that Sim had sexual quirks that they all eagerly indulged.

7.    All of these women were looking for a serious relationship, but Sim was not interested in pursuing such a relationship with them.

8.    When they found out that Sim was uninterested in having a monogamous relationship with them, Cho, Espitia, and Morey became so embarrassed that they decided to weaponize the criminal justice system against Sim.

9.    Campbell also willingly engaged in consensual sexual intercourse with Sim on one occasion before she too learned of Sim's disinterest in dating exclusivity.

10.    She became the self-proclaimed "ring leader" of the campaign to rob Sim of his freedom based on the shame experienced by women who found out they were not "the one."

11.    The City of Houston (*via* the Houston Police Department), Howton, and Koryciak facilitated the abuse of the criminal justice system by preparing false probable cause affidavits, withholding the existence of exonerating evidence from the Harris County District Attorney's Office, and tampering with Sim's electronic devices where the exonerating evidence was stored to ensure Sim's false arrest and malicious prosecution went forward.

12.    In the end, the truth thankfully prevailed, and all of the charges against Sim were dismissed when the Harris County District Attorney's Office was finally able to review the exonerating evidence improperly withheld or destroyed by the police.

13.     However, this is a textbook example of what happens when incredulous and fanciful stories are taken at face value by public servants who are more concerned with results than reality.

14.     Still, Sim has been greatly damaged by Defendants' actions, as his constitutional rights have been violated, his reputation has been tarnished, and future career prospects have been severely compromised, if not completely extinguished.

15.     As a result of Defendants' actions, Sim has suffered the loss of his rights under the Constitution of the United States, reputational damages, economic injuries, and the loss of career opportunities.

## THE PARTIES

16.     Sim is a natural person residing in Texas and former employee at the National Aeronautics and Space Administration ("NASA").

17.     The City of Houston is a Texas municipal corporation whose primary municipal law enforcement agency is the Houston Police Department, the employer of Katelyn Howton and Kirsten Koryciak.

18.     Katelyn Howton is a detective with the City of Houston Police Department residing in Texas.

19.     Kirsten Koryciak is a detective of the City of Houston Police Department residing in Texas.

20.     Sooyoun Cho is a natural person residing in Texas.

21.     Alejandra Espitia is a natural person residing in Texas.

22.     Mia Morey is a natural person residing in Texas.

23.     Madelynn Campbell is a natural person residing in Texas.

3

## JURISDICTION AND VENUE

24.     This Court has federal question jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 because  this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

25.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

26.     This Court has personal jurisdiction over the City of Houston because the City of Houston is a municipal entity in the State of Texas.

27.     The Court has personal jurisdiction over Howton because she is an employee of the City of Houston who resides in the State of Texas.

28.     The Court has personal jurisdiction over Koryciak because she is an employee of the City of Houston who resides in the State of Texas.

29.     The Court has personal jurisdiction over Cho because she is a resident of the State of Texas.

30.     The Court has personal jurisdiction over Espitia because she is a resident of the State of Texas.

31.     The Court has personal jurisdiction over Morey because she is a resident of the State of Texas.

32.     The Court has personal jurisdiction over Campbell because she is a resident of the State of Texas.

33.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this

judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    Sim's Relationship With Cho

34.    On June 25, 2021, Sim met Cho on the dating website KoreanCupid while Cho was in South Korea.

35.    Sim and Cho began messaging each other on the KakaoTalk application on June 26, 2021.

36.    Cho remained in South Korea during the end of June 2021, all of July 2021, and the beginning of August 2021.

37.    During the time Cho was in South Korea, she and Sim only communicated through text messaging applications.

38.    On July 3, 2021, Cho stated that she wanted to travel with Sim despite never meeting him in person.

39.    On July 8, 2021, Cho told Sim that she thought she was already falling in love with him despite knowing him for less than two weeks and only communicating with him through text messaging applications.

40.    On July 25, 2021, Cho told Sim that she loved him and wanted to kiss him "right now," again despite only communicating with him through text messages and never meeting him in person.

41.    On August 3, 2021, Cho told Sim that she dreamed that she had sex with him before expressing a hope that her dream would come true.

42.    Before she had even met Sim in person, Cho sent him multiple photographs of herself in revealing attire, including two bikini pictures.

43.    Cho returned to the United States from South Korea on August 5, 2021.

44.    On August 6, 2021, Sim and Cho met in person for the first time and went on their first date.

45.    Sim and Cho engaged in a consensual kiss in the parking garage of Cho's apartment complex after their first date on August 6, 2021.

46.    Later that evening after Sim had left Cho's apartment complex, Cho texted Sim to inform him that she really enjoyed her time with him, that she could not sleep because she was still thinking about him, and that she missed him.

47.    On August 7, 2021, Cho sent Sim a picture of herself in a bikini and told him that she missed him, referencing his touch and his scent.

48.    On August 8, 2021, Cho asked Sim to go out to dinner with her, and Sim agreed.

49.    During the August 8, 2021 dinner, Cho grabbed Sim's penis without being told to or asked to do so by Sim.

50.    On August 9, 2021, Cho told Sim that she loved him and promised to touch his penis again.

51.    On August 11, 2021, Cho visited Sim's home for the first time.

52.    Cho and Sim engaged in consensual sexual intercourse on August 11, 2021 at Sim's home.

53.    After she left Sim's home on August 11, 2021, Cho thanked Sim for the sexual encounter, which she said was "Very special!"

54.    On the morning of August 12, 2021, Cho texted Sim, "I love you."

55.    On August 14, 2021, Cho, who was a professional dancer with the Houston Ballet, sent Sim pictures of herself from her practice unprompted.

6

56.     Cho came to Sim's home again on August 15, 2021.

57.     Cho and Sim engaged in consensual sexual intercourse on August 15, 2021 at Sim's home.

58.     When she arrived at her apartment after having sex with Sim, Cho thanked Sim and said that she "had such a great time" with him.

59.     On August 16, 2021, Cho texted Sim to tell him that she "loved everything" about their sexual encounter the previous evening.

60.     On August 17, 2021, Cho invited Sim to her apartment and insinuated that she wanted to perform oral sex on him.

61.     Cho and Sim engaged in consensual sexual intercourse on August 17, 2021 at Cho's apartment.

62.     On August 18, 2021, Cho told Sim that she "had a great night" with him, referring to their sexual encounter on August 17, 2021, and that she loved him.

63.     Cho invited Sim to her apartment again on August 22, 2021.

64.     Cho and Sim had dinner at Cho's apartment on August 22, 2021 and did not engage in any sexual intercourse.

65.     Cho told Sim that she "had a good evening" with him and thanked him for coming.

66.     On August 23, 2021, Cho came to Sim's home and cooked dinner.

67.     Cho and Sim engaged in consensual sexual intercourse on August 23, 2021 at Sim's home.

68.     On August 25, 2021, Cho contacted Sim, asking to see him again, but Sim informed Cho that he was unavailable.

69.     On August 28, 2021, Sim picked up Cho and the two went on another date at Cho's

request.

70.     Cho and Sim did not engage in sexual intercourse on August 28, 2021.

71.     Cho and Sim had lunch together on August 29, 2021, once again at Cho's request.

72.     Cho and Sim did not engage in sexual intercourse on August 29, 2021.

73.     Cho invited Sim to dinner on August 30, 2021, and Sim accepted.

74.     After their dinner on August 30, 2021, Cho told Sim that she wanted to be his girlfriend.

75.     Cho and Sim did not engage in sexual intercourse on August 30, 2021.

76.     On August 31, 2021, Cho invited Sim to her upcoming ballet performance.

77.     On September 1, 2021, Cho drove to watch Sim play hockey in Sugar Land, Texas.

78.     Cho and Sim did not engage in sexual intercourse on September 1, 2021.

79.     From September 2021 through February 2022, Cho and Sim continued their consensual dating relationship.

80.     During this time period, Cho attended Sim's hockey games, sent Sim flirtatious and romantic messages, invited Sim to her ballet performances, cooked meals for Sim, and gave him rides to the airport when he needed to travel, among other signifiers of a consensual dating and sexual relationship.

81.     Between September 2021 and February 2022, Cho and Sim engaged in consensual sexual intercourse three times.

82.     Cho asked Sim to meet her for dinner on February 16, 2022.

83.     During their dinner on February 16, 2022, Cho told Sim that she was dating someone else.

84.     Despite making this disclosure, Cho went to Sim's home immediately after their

dinner ended, where they engaged in consensual sexual intercourse that was photographed and video recorded with Cho's consent.

85.    The several photos show Cho actively posing for Sim and smiling.

86.    The video of the encounter shows that Cho was a vocal, active, and willing participant in the consensual sexual intercourse.

87.    On February 17, 2022, Cho texted Sim that she was "so happy now!"

88.    Over the next few days, Cho continued to send Sim romantic messages.

89.    On February 20, 2022, Cho went to Sim's home, and they cooked dinner together.

90.    On February 21, 2022, Cho invited Sim to her apartment for dinner, but he was unable to attend due to work obligations.

91.    While Cho had exhibited jealous and insecure behavior during her relationship with Sim, things came to a head beginning on February 21, 2022.

92.    After Cho insulted his appearance, Sim decided to stop talking to her and end the relationship.

93.    Cho then proceeded to send a series of one-sided text messages nearly every day between the evening of February 21, 2022 and February 28, 2022 in a desperate attempt to preserve her relationship with Sim.

94.    Sim did not respond to any of Cho's messages during this period.

95.    Between March 5, 2022 and March 14, 2022, Cho sent another series of text messages seeking to rekindle her relationship with Sim.

96.    Sim did not respond to any of Cho's messages during this period.

**B.  Sim's Relationship with Espitia**

97.    Espitia and Sim began dating on April 8, 2021.

98.    After their first date on April 8, 2021, Espitia and Sim engaged in consensual kissing.

99.    Espitia and Sim had another date on April 10, 2021, after which they engaged in consensual kissing in Espitia's car.

100.    On April 12, 2021, Espitia invited Sim to a café to meet her daughter.

101.    After yet another date on April 13, 2021, Espitia and Sim had consensual sexual intercourse in Espitia's car.

102.    Espitia also sent Sim a photo of herself in lingerie on April 13, 2021.

103.    In a text message to Sim on April 14, 2021, Espitia described this sexual encounter as "amazing."

104.    Espitia came to Sim's house on April 22, 2021, had consensual sex with Sim, and stayed over for the night.

105.    Between April 23, 2021 and April 28, 2021, Espitia thanked Sim for this sexual encounter and engaged in overly sexual flirting *via* text messages.

106.    On April 28, 2021 Espitia went to Sim's hockey game in Sugar Land, Texas.

107.    On April 30, 2021, Espitia expressed her preference of being on top of Sim during their sexual encounters and sent Sim a video of her fondling her naked breasts.

108.    On May 15, 2021, Espitia told Sim that she missed him and sent him a provocative photo.

109.    Espitia sent Sim additional provocative photos of herself on May 16, 2021.

110.    On May 17, 2021, Espitia sent Sim a video of herself naked in her bathtub and expressed her desire for Sim to ejaculate inside of her.

111.    On May 24, 2021, Espitia picked up Sim from the airport and immediately drove

him to her home where they engaged in consensual sexual intercourse.

112.    On June 3, 2021, Espitia invited Sim to her home, and they engaged in consensual sexual intercourse.

113.    On June 13, 2021, Espitia texted Sim, "Im [*sic*] so horny babe I need you right now" along with a video of herself fondling her breasts and masturbating.

114.    On June 17, 2021, after Sim returned to Houston following a ten-day trip, Espitia went to Sim's home, and they engaged in consensual sexual intercourse.

115.    On June 18, 2021, Espitia and Sim went on a lunch date.

116.    On June 20, 2021, Espitia invited Sim to her home, and they engaged in consensual sexual intercourse.

117.    After Sim left Espitia's home on June 20, 2021, Espitia texted him expressing her satisfaction with their consensual sexual encounter.

118.    On June 21, 2021, Espitia expressed her desire to engage in anal sex with Sim.

119.    Espitia and Sim went on a dinner date on June 24, 2021.

120.    On July 7, 2021, Espitia invited Sim to her home to have drinks, but they did not engage in sexual intercourse because Sim had consumed too much alcohol.

121.    On July 8, 2021, after Sim informed her that he could not have sex while he was drunk, Espitia proposed that Sim should have sex with her while she was drunk and he was sober.

122.    On July 9, 2021, Sim drove Espitia and her daughter to the airport.

123.    Espitia and her daughter travelled to Colombia on July 9, 2021 and remained there until August 20, 2021.

124.    While she was in Colombia, Espitia sent Sim multiple overly sexual text messages.

125.    While Espitia was in Colombia, she asked Sim to feed her cats and water her plants,

which he did on July 31, August 12, and August 18, 2021.

126.    On August 11, 2021, Espitia sent Sim a photo of her naked breasts.

127.    On August 20, 2021, Sim picked up Espitia and her daughter from the airport upon their return from Colombia.

128.    Sim had dinner with Espitia and her daughter on August 20, 2021.

129.    On August 29, 2021, Espitia bought Sim dinner.

130.    On September 21, 2021, Espitia and Sim discussed engaging in anal sex.

131.    Following this conversation, Espitia purchased a sex toy to prepare herself for the possibility of anal sex with Sim.

132.    On September 24, 2021, Espitia went to Sim's house, where Espitia became drunk to the point of vomiting and, as a result, Espitia and Sim did not engage in sexual intercourse that evening.

133.    After September 24, 2021, Espitia continued to engage in friendly conversation with Sim.

134.    Notably, on October 1, 2021, Espitia asked Sim if he still had a sex toy that she brought to his house on September 24, 2021.

135.    On October 2, Espitia gave Sim a ride to the airport.

136.    During the course of their relationship, Espitia repeatedly made it clear that she wanted a serious relationship while Sim wanted something casual.

137.    Sim and Espitia eventually stopped communicating with and seeing each other as a result of these differing desires.

**C.  Sim's Relationship with Morey**

138.    Morey and Sim began texting each other in March 2022 after meeting on the dating

app OKCupid.

139. Morey and Sim had their first date on April 1, 2022.

140. Following this date, Morey and Sim engaged in consensual kissing in Morey's car.

141. On April 3, 2022, Morey went to Sim's home at 1AM, and they engaged in consensual sexual intercourse.

142. After she left his house following the consensual sexual encounter, Morey sent Sim a text message to tell him that "it was literally some of the best sex of my entire life."

143. In the same text message, Morey explicitly stated that she consented to having sex with Sim on April 3, 2022.

144. In another text message also sent on April 3, 2022, Morey thanked Sim "for an amazing night."

145. On April 16, 2022, Morey sent Sim a photo of her naked breasts.

146. After sending Sim this explicit photo, Morey went to Sim's home, and they engaged in consensual sexual intercourse.

147. While she was at Sim's home on April 16, 2022, Morey and Sim took a selfie together where Morey is smiling.

148. On April 17, 2022, Morey sent multiple text messages to Sim declaring how satisfied she was with the consensual sexual encounter from the previous evening.

149. In one text message sent to Sim on April 17, 2022, Morey stated, "Last night was heaven," referring to the consensual sexual encounter from the previous evening.

150. In another text message Morey told Sim, "You are the hottest thing ever."

151. Morey also sent Sim a photo of herself sitting in her car's driver seat smiling on April 17, 2022.

152.    On April 27, 2022 at 12:33AM, Morey sent Sim a photo of herself lying in bed with her shirt lifted up in order to expose her bare breasts.

153.    Morey invited Sim to her family's home on April 30, 2022, after which they had a dinner date.

154.    On May 5, 2022 at 1:28AM, Morey sent Sim a photo of herself lifting her shirt up to expose her left breast and partially exposing her right breast.

155.    On May 10, 2022, Morey picked up Sim from the airport.

156.    Morey and Sim went on a date at the Houston Museum of Fine Arts on May 13, 2022.

157.    During the course of their relationship, Morey made it clear that she wanted a serious relationship while Sim wanted something casual.

158.    The relationship between Morey and Sim ended in May 2022 later that month as a result of these differing desires.

### D.  Sim's Relationship with Madelynn Campbell

159.    Campbell and Sim dated briefly in April and May of 2022.

160.    Campbell and Sim went on dates on April 16, April 20, May 14, and May 29, 2022.

161.    Campbell and Sim engaged in consensual sexual intercourse on May 29, 2022.

162.    The relationship between Campbell and Sim was not exclusive or monogamous.

163.    On May 30, 2022, Campbell learned that Sim was also dating other women while he was seeing her.

164.    On that same day, Campbell posted a video online because she was upset to find out that Sim was seeing other women while they were dating and that Sim had sent a picture of food Campbell prepared to another woman.

165.    In the video, Campbell described her relationship with Sim prior to this revelation as "going really well."

166.    In the video, Campbell also stated that Sim complied with her request to use a condom during their May 29, 2022 sexual encounter and admitted that the encounter was consensual.

167.    Campbell's relationship with Sim ended because she wanted a serious relationship while he was only interested in a casual relationship.

### E. Sim's Relationship with Thea Chavez

168.    Chavez and Sim began conversing *via* text message on April 7, 2020.

169.    On May 6, 2020, Chavez and Sim had their first date at a park.

170.    On May 15, 2020, Chavez came to Sim's home, and they engaged in consensual sexual intercourse.

171.    After this consensual sexual encounter, Chavez posed in her underwear and a tight-fitting t-shirt so that Sim could take photos of her.

172.    Chavez then sat on Sim's lap while the two listened to music for approximately one half hour.

173.    When she returned to her home following this consensual sexual encounter, Chavez told Sim, "I had fun Mister Netflix and chill!!!!"

174.    On May 19, 2020, Chavez sent Sim three photos of herself in revealing outfits and one photo of herself lying nude in a prone position where the upper part of her buttocks was visible.

175.    Chavez invited Sim to her apartment on May 23, 2020, where they proceeded to have consensual sexual intercourse.

176.    After they engaged in consensual sexual intercourse, Chavez posed topless in her

underwear so that Sim could take photos of her.

177.    On June 6, 2020, Chavez went to Sim's home, and they engaged in consensual sexual intercourse.

178.    Chavez, who was a flight attendant at Southwest Airlines, went to Sim's home on June 10, 2020 to assist him in procuring a discounted plane ticket.

179.    Later that evening, Chavez went to watch Sim's hockey game.

180.    On August 2, 2020, Chavez and Sim went on another date where they played tennis and basketball before having dinner together.

181.    On August 10, 2020, Chavez once again assisted Sim in obtaining discounted plane tickets.

182.    Chavez and Sim met in New York City on August 14, 2020 and spent several hours together.

183.    On August 24, 2020, Chavez called Sim to express her dismay in her discovery that Sim was using dating apps, which led to the end of their relationship.

**F. Sim's Relationship with Krystina Azucena**

184.    Azucena and Sim began texting each other on July 9, 2019, and on that date, Azucena asked Sim out on a date.

185.    The pair had planned to meet on July 12, 2019, but Sim needed to cancel.

186.    Azucena and Sim had dinner together on July 14, 2019.

187.    After this date, Azucena and Sim engaged in consensual kissing in the restaurant parking lot.

188.    On July 18, 2019, Azucena went to Sim's home, and they engaged in consensual sexual intercourse.

189.    The July 18, 2019 encounter was filmed with Azucena's consent.

190.    The video of the July 19, 2019 consensual sexual encounter shows Azucena as a vocal, active, and willing participant.

191.    After she returned to her own home after having consensual sex with Sim, Azucena texted Sim to tell him that she had a "nice night" with him.

192.    On July 19, 2019, Azucena texted Sim, telling him, "I've never slept so good," followed by a smiling emoji, indicating that she enjoyed her consensual sexual encounter with Sim.

193.    On July 20, 2019, Azucena continued to text Sim and stated that she would give him a massage if she wasn't too busy at work.

194.    On July 22, 2019, Azucena invited Sim to go to the Candytopia exhibition in Houston with her.

195.    Between July 19 and July 23, 2019, Sim was extremely busy with graduate school work.

196.    Azucena interpreted Sim's focus on his studies as him having lost interest in her.

197.    On July 23, 2019, Azucena sent Sim a text message saying that she did not want to waste her time and get her feelings hurt if Sim was not interested in a committed relationship.

198.    Azucena and Sim exchanged text messages on July 23 and 24, 2019, but Sim's graduate school work continued to take up the majority of his time.

199.    As a result, Sim stopped messaging Azucena on July 24, 2019.

200.    Despite this clear expression of Sim's lack of interest, Azucena sent a message attempting to rekindle the relationship on August 16, 2019.

## G. Sim's Relationship with Nickole Ashlock

201.    Ashlock and Sim began texting each other on March 13, 2023.

202.    On April 4, 2023, Ashlock and Sim had their first date.

203.    Ashlock and Sim had their second date on April 12, 2023.

204.    Following their second date, Ashlock and Sim engaged in consensual kissing.

205.    Upon returning to her home, Ashlock sent Sim a text message stating that she "really enjoy[ed]" kissing Sim and thanking him for a "nice evening."

206.    On April 13, 2023, Ashlock went to Sim's home, where the two engaged in consensual sexual intercourse.

207.    After she returned to her own home, Ashlock texted Sim to express satisfaction with their sexual encounter and informed him that she was looking forward to their next sexual encounter.

208.    When Sim informed Ashlock that he was travelling to South Padre Island on April 16, 2023 for work, Ashlock texted him saying, "Wish I could be there too."

209.    Ashlock repeated her desire to be with Sim on South Padre Island in a text message she sent on April 17, 2023.

210.    On April 18, 2023, Ashlock went to Sim's home to have dinner.

211.    Following dinner, Ashlock and Sim engaged in consensual sexual intercourse.

212.    After she returned to her own home, Ashlock sent Sim a text message including a kiss emoji and stating that she "had fun" that evening.

213.    The relationship between Ashlock and Sim eventually ended because Ashlock wanted a committed relationship and Sim wanted something more casual.

### H. Cho, Espitia, Morey, and Campbell Conspire to Secure Sim's Malicious Prosecution

214.    After Campbell uploaded her video to TikTok on May 30, 2022, Morey left a comment on the video indicating her support for Campbell's views of Sim.

215.    Campbell subsequently became a member of a group chat with other women who Sim dated.

216.    The purpose of the group chat was to secure false criminal charges against Sim.

217.    Campbell added Cho to the group chat.

218.    Campbell and Cho discussed their experiences dating Sim.

219.    Campbell and Cho developed a plan to make false reports to the police asserting that Sim sexually assaulted them and that there was physical proof of the purported assault on Cho.

220.    Campbell also provided Cho with contact information for other women who had dated Sim.

221.    Cho then connected with Morey *via* social media.

222.    Cho and Morey discussed their experiences dating Sim.

223.    Cho and Morey developed a plan to make false reports to the police that Sim had sexually assaulted them.

224.    Morey connected with Espitia *via* social media.

225.    Morey and Espitia discussed their experiences dating Sim.

226.    Morey and Espitia developed a plan to make false reports to the police asserting that Sim had sexually assaulted them.

227.    Cho, Espitia, Morey, and Campbell all made false reports to the police asserting that Sim sexually assaulted them.

228.    During a conversation with the police, Campbell admitted to being the ringleader

of the wave of false complaints that were being made against Sim.

**I.    Sim is Arrested Based on Cho and Espitia's False Accusations and Howton's False Probable Cause Affidavits**

229.    On February 28, 2024, Howton conducted an interview of Cho.

230.    At the beginning of the interview, Cho stated that she could not speak English well.

231.    Despite this admission from Cho, Howton continued with the interview without the aid of a translator.

232.    At the beginning of the interview, Cho informed Howton about the group chat she had been added to with other women that Sim had dated.

233.    Cho then indicated that her participation in the group chat was the impetus for speaking with the police.

234.    Cho also stated that her "memory already erased" the sexual encounter because its "been a while" at the outset of the interview.

235.    Later in the interview, Cho laughed and stated that she "removed [her] memory" of the sexual encounter because its "been a while."

236.    Cho repeatedly used the words "I don't remember," "maybe," "I guess," "I think," or "I believe" when asked to recount specific facts about her relationship with Sim and the sexual encounter.

237.    Cho could not remember, among other things, how she got into Sim's bed, what she was wearing on the night in question, or whether a condom was used during the encounter.

238.    Cho also asserted that Sim tied her up during the encounter, but she could not remember how he tied her up.

239.    During the interview, Cho falsely stated that she was not ready to have sex with Sim in August of 2021, that she resisted Sim's sexual advances, and that he penetrated her and

recorded their encounter without her consent.

240.     Cho also falsely stated that she asked Sim to delete the video of the encounter and that she was angry about the sexual encounter.

241.     Cho could not state when the sexual encounter in question took place.

242.     When Howton asked her if August 2021 sounded correct, Cho responded, "Yeah. Maybe."

243.     After giving this equivocal response, Cho asserted that she only started talking to Sim a year before the interview, which would have meant she first spoke to Sim in early 2023.

244.     Cho then nonsensically asserted that there was a Christmas tree in Sim's home on the night the purported assault took place.

245.     When Howton asked Cho if Sim put anything in her vagina, Cho said, "No."

246.     Cho also claimed that her vagina was hurting and that she was bleeding from her vagina during the sexual encounter but admitted that she did not know what caused the pain or what caused her to bleed.

247.     Later in the interview, Cho contradicted herself by stating that Sim put his penis in her vagina, which is what caused her to bleed.

248.     Cho also laughed at various times throughout the interview when describing the sexual encounter.

249.     A significant portion of the interview also consisted of Howton narrating supposed "facts" and Cho agreeing with Howton.

250.     Cho also stated that as she and Sim were leaving his home together after the encounter she thought "maybe I can try" to have a relationship with Sim.

251.     Cho also stated that when she arrived at her car after the encounter and saw that it

had been broken into, she called Sim for help.

252.    When she was asked if she wanted to press charges, Cho laughed before responding, "Yes."

253.    Howton interviewed Espitia on February 22, 2024.

254.    In speaking with Howton, Espitia was unable to state when she started dating Sim, as she alternatively stated that they began dating in March, April, May, and June of 2021.

255.    During the interview, Espitia stated that she went to Sim's house one evening to Netflix and chill, a slang term for a casual sexual encounter.

256.    Espitia was referring to the time she went to Sim's home on September 24, 2021.

257.    Espitia specifically stated during the interview, "To be honest, when you say Netflix and chill, it's gonna happen," referring to sexual intercourse.

258.    She falsely informed Howton that this was the first and only time that she and Sim had sex.

259.    Espitia told Howton that she drank so much wine during the evening that she blacked out.

260.    Espitia also stated that when she woke up the next morning in Sim's bed she did not remember anything that happened in Sim's bedroom other than Sim giving her a Versace necklace as a gift.

261.    Espitia asserted that she then went to brunch with Sim, which is when she first noticed pain in her shoulder and knee accompanied by bruises.

262.    Espitia also told Howton that she first noticed that her vagina was swollen at the brunch and that when she used the bathroom she noticed there was semen in her vagina.

263.    Espitia informed Howton that when she returned to the brunch table following this

supposed discovery, she started asking Sim questions, but he didn't want to talk, which made Espitia angry.

264.   She also told Howton that a conversation with her friend during the brunch regarding the encounter made her realize that "maybe" Sim put something in her food or drink.

265.   Espitia informed Howton that her friend "started, like, putting the stuff in [Espitia's] mind" during the conversation, referring to the unfounded claim that she had been drugged.

266.   Later in the interview, Espitia told Howton that she conclusively determined that Sim had drugged her after she took ayahuasca, a powerful hallucinogenic drug.

267.   However, just prior to her recounting of her drug-fueled revelation, Espitia explicitly stated, "I don't remember what happened," when referring to the sexual encounter.

268.   Espitia falsely told Howton that she immediately blocked Sim after the brunch where she purportedly discovered semen in her vagina while urinating, which would have occurred on September 25, 2021.

269.   During the interview, Espitia showed Howton photos of bruises that were purportedly caused by Sim.

270.   Howton made no effort to verify the authenticity of these photos or establish that they were taken close in time to September 24, 2021 during the interview.

271.   Espitia falsely claimed that Sim gave her a sexually transmitted disease as a result of their encounter, but she was unable to provide any medical record to support this assertion and could not name the doctor or clinic that diagnosed her and prescribed her medication.

272.   She also informed Howton that she waited until two weeks after the sexual encounter to get tested for sexually transmitted diseases.

273.    Towards the end of the interview, Espitia falsely stated that she played coy and was interested in having sex with Sim at the start of their relationship.

274.    At the end of the interview, Espitia once again admitted that she did not remember "dates or things like that," referring to the sexual encounter with Sim.

275.    Based on her interviews with Cho and Espitia, Howton prepared and presented probable cause affidavits in order to obtain an arrest warrant for Sim.

276.    As detailed above, Cho and Espitia were unable to remember key details regarding their sexual encounters with Sim and other provided inconsistent and implausible information that could not possibly establish that there was probable cause to arrest Sim.

277.    However, Howton ignored these glaring issues and successfully obtained a warrant for Sim's arrest by falsely asserting that there was probable cause to believe that Sim sexually assaulted Cho and Espitia.

278.    In her affidavit regarding Cho, Howton stated that there was "good reason to believe on or about August 1st 2021, Soo Cho's sexual organ was unlawfully caused to contact the sexual organ of Eric Sim without consent."

279.    Howton swore to the veracity of this statement despite the fact that she knew that Cho and Sim's sexual encounter did not occur on August 1, 2021.

280.    During the interview, Howton went over a statement that Cho had given to NASA regarding the sexual encounter.

281.    In her statement to NASA, Cho stated that the sexual encounter at issue occurred in mid-August 2021.

282.    Thus, Howton's statement that the encounter occurred on or around August 1, 2021 was unquestionably false.

283.    In preparing and swearing to the truth of her affidavit, Howton ignored the fact that Cho either could not remember or was equivocal regarding crucial details of her sexual encounter with Sim, most notably whether anything was inserted into her vagina during the course of the encounter.

284.    Howton also failed to interview Sim before preparing and swearing to the truth of her affidavit.

285.    Despite the issues noted above, Howton still swore that there was probable cause to establish that Sim sexually assaulted Cho when, in fact, none existed.

286.    In her affidavit regarding Espitia, Howton stated that there was "good reason to believe on or about September 24th 2021, Alejandra Espitia's sexual organ was unlawfully caused to contact the sexual organ of Eric Sim without consent."

287.    Howton swore to the veracity of this statement despite Espitia's admission that she did not remember anything about the sexual encounter and her outrageous claim that an ayahuasca trip confirmed that Sim had drugged her.

288.    Howton also failed to interview Sim before preparing and swearing to the truth of her affidavit.

289.    Despite the issues noted above, Howton still swore that there was probable cause to establish that Sim sexually assaulted Espitia when, in fact, none existed.

290.    An invalid arrest warrant was issued based on Howton's untrue affidavits.

291.    The invalid arrest warrant was executed on February 29, 2024 when Sim was taken into police custody against his will by Howton and Koryciak.

**J.  The False Statements Made to the Police by Other Accusers**

292.    Howton interviewed Chavez on February 23, 2024.

293.    During the interview, Chavez admitted that her sexual encounter with Sim on May 15, 2020 was consensual.

294.    Howton also described the encounter as consensual while she was questioning Chavez.

295.    Chavez also offered contradictory statements falsely alleging the Sim held her down on the bed, forcibly removed her clothes, and had sex with her even though she said she was not ready.

296.    She then informed Howton that she took a shower with Sim after their sexual encounter.

297.    Chavez described the atmosphere in the shower as "casual."

298.    She falsely told Howton that she left immediately after taking a shower with Sim.

299.    Chavez also told Howton that she went on another date with Sim after the May 15, 2020 encounter and had sex with him again, after which Sim allegedly asked Chavez to be his girlfriend, which surprised her because she thought they were already in a monogamous relationship.

300.    Chavez told Howton that she felt "used" by Sim due to his lack of commitment to her but that there was no basis for a criminal charge against him.

301.    To this end, Chavez informed Howton that she was frustrated due to Sim's lack of commitment and became upset when she discovered an Instagram account detailing Sim's relationships with other women.

302.    Chavez falsely asserted that Sim ended their relationship by "ghosting" her while also admitting that she texted him "Have a nice life" after discovering the Instagram detailing his relationships with other women.

303.    She also admitted that she collaborated with the other women who dated Sim whom she had met online to harass Sim.

304.    Chavez also confessed to Howton that she was afraid of being sued by Sim for defamation.

305.    Despite Chavez admitting the encounter was consensual, Howton describing the encounter as consensual herself at one point, and Chavez's statement that she did not believe criminal charges were appropriate, Howton concluded the interview by stating that she believed a crime had occurred.

306.    Howton subsequently prepared a probable cause affidavit asserting that there was good cause to believe that Sim sexually assaulted Chavez on May 15, 2020.

307.    Howton and Koryciak interviewed Morey on March 8, 2024.

308.    During the interview, Morey admitted that her sexual encounter with Sim was consensual.

309.    Despite this admission, Koryciak told Morey that she had been raped.

310.    Morey also described the moment where Sim lifted her up to carry her up the stairs immediately prior to the encounter as a "romance storybook."

311.    Morey also told Howton and Koryciak that after her first date with Sim, which occurred the day before their sexual encounter, she decided that she was "ready to marry him."

312.    In reality, Morey's real concern, which she expressed to Howton and Koryciak, was that her sexually graphic text messages with Sim would become public.

313.    Koryciak responded by assuring Morey that the Houston Police Department would "deal with" Morey's concerns regarding her explicit messages with Sim.

314.    Morey also told Howton and Koryciak that she did not like the fact that Sim was

"giving off major player vibes" due to the fact that he followed many attractive women on Instagram.

315.    Morey further indicated that she became upset after finding out that Sim was dating other women during their relationship and had no intention of stopping this behavior, which is when she decided to end her relationship with him.

316.    Morey informed Howton and Koryciak that she wanted to press charges against Sim.

317.    In her affidavit regarding Morey, Howton stated that there was "good reason to believe on or about April 3, 2022, Mia Morey's sexual organ was unlawfully caused to contact the sexual organ of Eric Sim without consent."

318.    Howton's perjurious affidavit completely ignored the fact that Morey admitted that her sexual encounter with Sim was consensual and Morey's obvious infatuation with Sim prior to their sexual encounter.

319.    Howton conducted a telephone interview with Azucena on March 15, 2024.

320.    During the interview, Azucena provided an inconsistent and illogical summary of her sexual encounter with Sim.

321.    In describing the encounter, Azucena used the words, "we'd slept together that night."

322.    During the interview, Azucena falsely asserted that her sexual encounter occurred in August 2019.

323.    Because Azucena could not provide a specific date for the encounter, Howton engaged in Google searches based on what Azucena and Sim were watching on television that evening to try to pinpoint a date.

324.    She also falsely claimed that she "ghosted" Sim after their encounter.

325.    Azucena informed Howton that she did not completely remember what happened between her and Sim and asserted that she forgot how to get home after the encounter.

326.    Azucena told Howton that she did not want to be involved in any criminal proceeding, but Howton told Azucena that the Houston Police Department was trying to show a pattern of Sim supposedly assaulting multiple women and that the case against Sim would be stronger if Azucena was involved.

327.    In her affidavit regarding Azucena, Howton stated that there was "good reason to believe on or about August 1, 2019, Krystina Azucena's sexual organ was unlawfully caused to contact the sexual organ of Eric Sim without consent."

328.    Howton made this statement despite Azucena's inconsistent and illogical testimony, her inability to specifically state when the sexual encounter occurred, and her admission that she did not remember everything about the encounter.

329.    Howton interviewed Xi Chen on February 24, 2024.

330.    Sim does not have any recollection of any sort of interaction, sexual or otherwise, with Chen.

331.    Sim does not have any contact named Xi Chen in his phone, nor are there any calendar entries or text messages referencing Chen.

332.    At the outset of the interview, Howton told Chen that the Houston Police Department was looking for additional accusers to build a good case against Sim.

333.    Chen responded by telling Howton that she did not want the police to "destroy" Sim.

334.    Chen also stated that she had "empathy" towards Sim and did not want to press

charges.

335.    Chen informed Howton that she invited Sim to her home for lunch and that he wanted to have sex.

336.    She told Howton that Sim touched her breasts and performed oral sex on her but "It wasn't bad or hard" and that it was "not forceful."

337.    Chen also reiterated that the oral sex did not make her uncomfortable and that she was "okay with it."

338.    She also confirmed that she was "okay with" Sim touching her breasts.

339.    Howton then referred to a false report that Chen had made immediately after the non-existent encounter asserting that she inexplicably ran away from Sim after this consensual encounter which led to Sim going after Chen, picking her up, and bringing her back to the bedroom.

340.    Somehow, Chen had forgotten this until she was reminded by Howton.

341.    According to Chen, this second encounter that she suddenly remembered involved a one to two hour period where she wrestled with Sim (who she described as much stronger than her) on her bed.

342.    Chen also admitted to Howton that she did not remember if Sim penetrated her during the second instance but that she "believe[d] he did."

343.    Chen also conceded, "I don't really remember the details" of the encounter with Sim.

344.    She also could not remember when Sim arrived at her home.

345.    Chen claimed that after the encounter she went to the hospital where doctors supposedly observed bruises in her vagina but no bruises on her body despite the hour-plus long wrestling ordeal she was purportedly subjected to by a much stronger man.

346.    Chen further asserted that she reported the incident to the police and showed them a picture of Sim from his Facebook profile.

347.    Howton read a portion of the prior report made by Chen where Chen asserted that the breast touching and oral sex were not consensual, directly contradicting that Chen had just told Howton.

348.    Howton also read a portion of the report where Chen asserted that Sim penetrated her vagina with his penis.

349.    However, in describing the fictional encounter to Howton, Chen also stated, "it wasn't bad," and that Sim "didn't really like insert" his penis.

350.    In her affidavit regarding Chen, Howton stated that there was "good reason to believe on or about September 22, 2019, Xi Chen's sexual organ was unlawfully caused to contact the sexual organ of Eric Sim without consent."

351.    Howton made this statement under penalty of perjury despite the fact that Chen provided inconsistent and contradictory information regarding the supposed encounter.

352.    Howton interviewed Nickole Ashlock on May 10, 2024.

353.    At the beginning of the interview, Howton acknowledged that Ashlock had no interest in pursuing criminal charges against Sim and then informed Ashlock that a criminal case could be pursued whether Ashlock wanted to or not.

354.    Howton also expressed a desire to get Sim "locked away."

355.    During the interview, Ashlock informed Howton that Campbell had contacted her about speaking to the police.

356.    Ashlock also provided a false recounting of her first kiss with Sim and lied about when she next saw Sim after the supposedly non-consensual sexual encounter.

357.    She also falsely portrayed Sim as the one seeking a relationship when, in reality, Ashlock was desperate to spend time with Sim.

358.    Ashlock repeatedly referred to her encounter with Sim as "sex" and not "assault."

359.    Ashlock also stated that she could not remember exactly what happened during her encounter with Sim and did not mention that she had consensual sex with Sim the week prior to the encounter she was discussing with Howton.

360.    In describing Sim's physical appearance, Ashlock falsely stated that Sim was bald when she knew him.

361.    Ashlock admitted that she was looking for a serious relationship and became upset with Sim when she learned that he was dating other women while he was seeing her.

362.    In her affidavit regarding Ashlock, Howton stated that there was "good reason to believe on or about April 20, 2023, Nickole Ashlock's sexual organ was unlawfully caused to contact the sexual organ of Eric Sim without consent."

363.    Howton made this statement despite the fact that Ashlock offered provably false testimony, admitted that she could not remember the details of her sexual encounter with Sim, and identified a clear motive for wanting to harm Sim.

## K. The Criminal Proceeding Against Sim Continues Based on The False Statements Made by the Other Accusers and the City of Houston, Howton, and Koryciak's Willful Misconduct

364.    After Sim was arrested, the Houston Police Department raided his home and seized his electronic devices on February 29, 2024.

365.    Notably, as detailed extensively above, Sim's electronic devices contained proof that Cho and Espitia were lying about the nature of their encounters with Sim and that the arrest warrant was invalid.

366.    The City of Houston, *via* the Houston Police Department had full access to Sim's

electronic devices as well as the communications, photos, and videos on the devices beginning on February 29, 2024

367. Howton, and Koryciak had full access to Sim's electronic devices as well as the communications, photos, and videos on the devices beginning on February 29, 2024.

368. On March 1, 2024, Howton and Koryciak interviewed Sim.

369. During the interview, Howton and Koryciak informed Sim that four women – Cho, Espitia, Chavez, and Xi Chen – were alleging that he sexually assaulted them.

370. Sim has never met anyone named Xi Chen.

371. Sim informed Howton and Koryciak that he did not know who Xi Chen was.

372. Sim also told Howton and Koryciak that he had dated Cho, Espitia, and Chavez over a period of several months and that all three of these women were involved in a smear campaign against him organized by Campbell that he had identified by reviewing the Instagram page detailing his consensual dalliances with multiple women.

373. After Howton and Koryciak told Sim about the accusations made by Cho, Espitia, and Chavez, Sim informed them that the accusations were false and brought up specific facts that contradicted their stories.

374. Sim also reiterated that these were women that he had long-term relationships with.

375. Howton and Koryciak ignored the exculpatory information that Sim provided, as they had already settled on their own narrative that Sim was a serial sexual assaulter.

376. Later in the day on March 1, 2024, Sim was formally charged with sexually assaulting Cho and Espitia.

377. At the March 1, 2024 arraignment, Sim was required to post a $1,000,000 bond, submit to 24/7 house arrest with a GPS ankle monitor, and agree not to contact the complainants

if he wished to be let out on bail.

378.    Sim was held in jail for the next three days until his next court appearance on March 4, 2024.

379.    At the March 4, 2024 court appearance, Sim's bond was reduced to $500,000, but additional conditions in addition to those imposed on March 1, 2024 were added, namely, Sim was required to install software on the electronic devices the police had not yet seized so that his Internet activity could be monitored, and he was barred from using social media and dating websites.

380.    Sim was released on Bond later in the day on March 4, 2024.

381.    As noted above, the City of Houston, *via* the Houston Police Department, had full access to Sim's electronic devices and the exonerating evidence contained on them when Sim was charged with sexually assaulting Cho and Espitia.

382.    As noted above, Howton and Koryciak had full access to Sim's electronic devices and the exonerating evidence contained on them when Sim was charged with sexually assaulting Cho and Espitia.

383.    The City of Houston, Howton, and Koryciak all failed to inform the Harris County District Attorney's office about the existence of the exonerating evidence contained on Sim's electronic devices prior to charges being levied against him for sexually assaulting Cho and Espitia.

384.    After Sim was arrested, Howton interviewed Campbell.

385.    Campbell admitted that Sim did not sexually assault her but falsely claimed that he had tried to do so.

386.    In reality, and as Campbell told Howton, Campbell requested that Sim wear a

condom during sexual intercourse, and he complied.

387.   During the interview, Howton described Campbell as the "ringleader" of the women who were falsely accusing Sim of sexual assault, and Campbell agreed with that description.

388.   Howton then asked Campbell to speak with Sim's accusers to try to convince them to formalize their complaints with the police.

389.   Howton also informed Campbell that Sim was in jail and that she was trying to keep him there.

390.   Campbell falsely told Howton that Sim "did a lot of weird stuff" to Morey.

391.   On March 28, 2024, Sim was charged with sexually assaulting Chavez, Morey, Azucena, and Chen.

392.   Sim was also subjected to a DNA swab on March 28, 2024.

393.   As detailed extensively above, Sim's electronic devices contained proof that Chavez, Morey, Azucena, and Chen were lying about the nature of their encounters with Sim and that the arrest warrant was invalid.

394.   The City of Houston, *via* the Houston Police Department, had full access to Sim's electronic devices and the data contained on them when it charged Sim with sexually assaulting Chavez, Morey, Azucena, and Chen.

395.   Howton and Koryciak had full access to Sim's electronic devices and the data contained on them when they secured the criminal charges against Sim for the purported sexual assaults of Chavez, Morey, Azucena, and Chen.

396.   The City of Houston, Howton, and Koryciak all failed to inform the Harris County District Attorney's office about the existence of the exonerating evidence contained on Sim's

electronic devices prior to charges being levied against him for sexually assaulting Chavez, Morey, Azucena, and Chen.

397.    On April 12, 2024, NASA contacted Sim to inform him that he was being suspended without pay as a result of the criminal charges pending against him.

398.    Sim was ultimately forced to resign from NASA.

399.    Sim attended another court appearance on April 29, 2024, but there was no further action taken because the Harris County District Attorney's Office claimed they needed additional time to prepare its case.

400.    On June 4, 2024, Sim was charged with sexually assaulting Nickole Ashlock.

401.    At the June 4, 2024 court appearance, Sim's 24/7 house arrest was reduced to a 7PM to 7AM curfew, though he was still required to wear a GPS ankle monitor at all times.

402.    As detailed extensively above, Sim's electronic devices contained proof that Ashlock was lying about the nature of her encounter with Sim and that the arrest warrant was invalid.

403.    The City of Houston, *via* the Houston Police Department, had full access to Sim's electronic devices and the exonerating data contained on them when it charged Sim with sexually assaulting Ashlock.

404.    Howton and Koryciak had full access to Sim's electronic devices and the exonerating data contained on them when they secured the criminal charges against Sim for the purported sexual assault of Ashlock.

405.    The City of Houston, Howton, and Koryciak all failed to inform the Harris County District Attorney's office about the existence of the exonerating evidence contained on Sim's electronic devices prior to charges being levied against him for sexually assaulting Ashlock.

406.    After Sim was charged with sexually assaulting Cho, Espitia, Chavez, Morey, Azucena, Chen, and Ashlock, the criminal prosecution continued.

407.    The City of Houston, *via* the Houston Police Department, had full access to Sim's electronic devices and the exonerating data contained on them throughout the entirety of the criminal prosecution against Sim for the purported sexual assaults of Cho, Espitia, Chavez, Morey, Azucena, Chen, and Ashlock.

408.    Howton and Koryciak had full access to Sim's electronic devices and the exonerating data contained on them throughout the entirety of the criminal prosecution against Sim for the purported sexual assaults of Cho, Espitia, Chavez, Morey, Azucena, Chen, and Ashlock.

409.    The City of Houston, Howton, and Koryciak all failed to inform the Harris County District Attorney's Office about the existence of the exonerating evidence contained on Sim's electronic devices prior to charges being levied against him for sexually assaulting Cho, Espitia, Chavez, Morey, Azucena, Chen, and Ashlock.

410.    This failure to inform the Harris County District Attorney's Office about the exonerating evidence on Sim's electronic devices subjected Sim to a needlessly drawn out criminal prosecution.

411.    Howton's stated intent to get Sim "locked away" and keep him in jail shows that the repeated failures by the City of Houston, Howton, and Koryciak to inform that Harris County District Attorney's Office about the exonerating evidence was intentional.

412.    On June 21, 2024, Howton provided a magistrate judge with false information to secure a meritless search warrant of Sim's home.

413.    Specifically, Howton asserted that she obtained additional evidence from Sim's

electronically stored information that indicated that further crimes had been committed.

414.    As detailed extensively above, all of the evidence available on Sim's electronic devices proved that he had not committed sexual assault – or any other crime – against Cho, Espitia, Chavez, Morey, Azucena, Chen, or Ashlock.

415.    Nonetheless, Howton obtained the invalid warrant, and police showed up at Sim's home with their guns drawn when he answered the door.

416.    In executing the invalid warrant, Howton, Koryciak, and other members of the Houston Police Department seized Sim's personal items that were not related to any of the pending charges, trashed his home, and took a journal related to the criminal charges that Sim had prepared at the direction of his criminal counsel that contained information that was obviously covered by the attorney-client privilege and work product doctrine.

417.    Sim attended another court date regarding the criminal charges pending against him on June 25, 2024.

418.    Once again, the Harris County District Attorney's Office stalled, and the case did not move forward.

419.    Thus, the continued failure by the City of Houston (*via* the Houston Police Department), Howton, and Koryciak to inform the Harris County District Attorney's Office about the exonerating evidence on Sim's electronic devices once again caused the needless continuation of the criminal prosecution.

420.    Another court appearance occurred on July 23, 2024, but the Harris County District Attorney's Office was still not ready to proceed with the case.

421.    This was yet another delay in the criminal prosecution caused by the City of Houston (*via* the Houston Police Department), Howton, and Koryciak's failure to advise the Harris

County District Attorney's Office of the existence of exonerating evidence.

422.     On July 25, 2024, Sim received digital copies of some of the electronic devices seized by the police.

423.     Upon inspection of the digital copies of the devices, it became clear that the devices had been tampered with and that exonerating evidence was deleted from them.

424.     Most notably, the video of the sexual encounter between Sim and Azucena that was recorded with Azucena's knowledge and consent was not present in digital copies Sim received.

425.     This video provided incontrovertible evidence that the encounter between Sim and Azucena that formed the basis of the criminal complaint was consensual.

426.      Sim's text messages with several of the accusers were also not present on the digital copies of his devices.

427.     These text messages also showed that the sexual encounters between Sim and the purported victims – most notably Morey – were consensual.

428.     Other files were clearly altered, as the metadata in the digital copies showed dates that occurred after the devices were seized by the police.

429.     A digital copy of one of the hard drives that was seized was also unusable, as the code necessary for the data to be viewed in a forensic software application had been removed.

430.      On August 18, 2024, Sim received digital copies of additional devices seized by the police.

431.     Of the seven copies of Sim's electronic devices provided, two could not be opened.

432.     The remaining five copies were for devices that did not contain any relevant data, indicating that these devices were improperly seized.

433.     On August 29, 2024, Sim attended another court conference where the Harris

County District Attorney was once again not ready to proceed.

434.    Thus, the continued failure by the City of Houston (*via* the Houston Police Department), Howton, and Koryciak to inform the Harris County District Attorney's Office about the exonerating evidence on Sim's electronic devices once again caused the needless continuation of the criminal prosecution.

435.    On September 4, 2024, Sim was allowed to remove the GPS ankle monitoring device, but the other conditions of his bail remained in place.

436.    On October 12, 2024, Sim finally received digital copies of his devices containing the exonerating evidence detailed extensively above.

437.    On February 25, 2025, all of the pending criminal charges against Sim were dismissed, six for a lack of proof and one at the request of one of the false complainants.

### L.  The City of Houston's Unconstitutional Official Policies and Customs

438.    Prior to and during the relevant time period, the City of Houston (*via* the Houston Police Department) engaged in widespread practices related to the preparation of false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department that were so common and well-settled as to constitute a custom that fairly represents municipal policy.

439.    In 2019, judges and magistrates in Harris County ruled there was no probable cause in 3,217 misdemeanor and felony cases.

440.    The Houston Police Department was involved in 1,656 of these cases.

441.    In February 2019, the Houston Police Department executed an arrest warrant obtained *via* a probable cause affidavit prepared by one of its officers that contained false information.

442.    In the course of executing the faulty arrest warrant based on the false information

provided by one of its officers, the Houston Police Department killed a married couple in their home.

443.    Despite the abhorrent miscarriage of justice that led to the killing of two individuals without probable cause, the Houston Police Department's practice of fabricating false information to secure faulty warrants and effect illegal arrests continued unabated.

444.    In September 2023, officers from the Houston Police Department falsely informed the Harris County District Attorney's Office that a mother was violating a custody order and attempting to abduct her own child.

445.    However, the custody order was no longer in effect.

446.    Even after they became aware that there was no custody order preventing the mother from leaving the country with her child, the Houston Police Department officers still provided sworn affidavits stating that the mother was violating the non-existent custody order that led to her illegal arrest for felony interference with child custody.

447.    On August 21 2024, the Houston Police Department's Independent Review Committee issued a report on problems within the Houston Police Department (the "Deficiency Report").

448.    The Deficiency Report analyzed data related to cases handled by the Houston Police Department from 2016 to 2024.

449.    The Deficiency Report stated that divisions within the Houston Police Department have near complete autonomy to create protocols for case management and as a result policies and practices among divisions are inconsistent and outdated.

450.    The Deficiency Report also noted that upon promotion and/or transfer, supervisors at every rank within the Houston Police Department are not sufficiently trained to effectively

manage their team.

451.    Based on the findings in the Deficiency Report, the City of Houston was aware of structural deficiencies within the Houston Police Department that would lead to constitutional violations for at least eight years.

452.    Despite this knowledge, the City of Houston took no steps to remedy the known structural deficiencies.

453.    As detailed extensively above and below, Plaintiff was improperly subjected to the Houston Police Department's continuing widespread practices related to the preparation of false probable cause affidavits and effecting illegal arrests.

454.    The City of Houston had knowledge of the structural deficiencies that led to these gross constitutional violations of Plaintiff's rights, but took no steps to prevent the violations from occurring.

455.    Before Plaintiff's arrest, the Houston Police Department's Special Victims Division customarily approved felony sexual-assault warrant affidavits without meaningful supervisory review, including by ignoring inconsistencies, contradictory statements, and the lack of corroboration.

456.    In practice, the City of Houston vested Houston Police Department supervisors, including in the Special Victims Division, with final authority over warrant affidavits, investigation continuation, and disclosures to prosecutors, and those decisions functioned as municipal policy because they were not meaningfully reviewed by higher command.

457.    The City of Houston maintained a custom of inadequate training on handling contradictory complainant statements, preparing warrant affidavits without material omissions or mischaracterizations, and disclosing exculpatory digital evidence to prosecutors, making the

violations alleged here highly predictable.

458.    Alternatively, the City of Houston ratified its officers' unconstitutional conduct by allowing the prosecution to continue and authorizing further investigative steps, including the June 21, 2024 search of Plaintiff's home, after supervisors knew of contradictions, exculpatory digital evidence, and the lack of probable cause.

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST HOWTON AND KORYCIAK

**(42 U.S.C. § 1983 – Fourth Amendment False Arrest)**

459.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

460.    On February 29, 2024, Howton and Koryciak willfully detained Sim without his consent by effecting an arrest.

461.    Howton and Koryciak detained Sim without authority of law.

462.    Howton relied on false testimony provided by Cho and Espitia to obtain the warrant for Sim's arrest.

463.    However, as detailed above, the information provided by Cho and Espitia did not establish that there was probable cause to arrest Sim.

464.    Thus, a reasonable officer would not have believed that a crime had been committed based upon an objective review of the evidence available to Howton and Koryciak at the time of Sim's arrest.

465.    The elements of a false arrest claim based on an invalid warrant were clearly established by the Fifth Circuit at the time of Sim's arrest.

466.    Accordingly, Sim was subjected to a false arrest on February 29, 2024 in violation of the Fourth Amendment of the United States Constitution.

467.    As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST HOWTON AND KORYCIAK

**(42 U.S.C. § 1983 – Fourth Amendment Malicious Prosecution)**

468.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

469.    A cause of action for malicious prosecution against a state actor occurs upon (1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendants against the plaintiff who was the defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; (6) damages; and (7) an unlawful Fourth Amendment seizure.

470.    A criminal proceeding was commenced against Sim by the Harris County District Attorney's Office.

471.    Following its commencement, the criminal proceeding continued against Sim.

472.    Howton was responsible for commencing and continuing the criminal proceeding against Sim because she made, influenced, and participated in the decision to prosecute Sim.

473.    Specifically, Howton lied to and misled the Harris County District Attorney's Office and failed to disclose exculpatory evidence to the Harris County District Attorney's Office.

474.    Howton's misconduct caused the Harris County District Attorney's Office's decision to commence and continue the criminal proceeding against Sim.

475.    Koryciak was responsible for commencing and continuing the criminal proceeding against Sim because she made, influenced, and participated in the decision to prosecute Sim.

476.    Specifically, Koryciak lied to and misled the Harris County District Attorney's

Office and failed to disclose exculpatory evidence to the Harris County District Attorney's Office

477.    The criminal proceeding continued against Sim.

478.    Koryciak's misconduct caused the Harris County District Attorney's Office's decision to commence and continue the criminal proceeding against Sim.

479.    The criminal proceeding terminated in Sim's favor when all charges were dismissed on February 25, 2025.

480.    There was a lack of probable cause for the commencement and continuation of the criminal proceeding against Sim.

481.    During the commencement and continuation of the criminal proceeding against Sim, Howton and Koryciak created testimony for witnesses, ignored evidence indicating that the sexual acts in question were consensual, and otherwise misrepresented witness testimony to the Harris County District Attorney.

482.    A reasonable officer would not have believed that a crime had been committed based upon an objective review of the evidence available to Howton and Koryciak at the time of the commencement and continuation of the criminal proceeding against Sim.

483.    Because there was no probable cause, the City of Houston, Howton, and Koryciak acted with malice in commencing and continuing the criminal proceeding against Sim.

484.    Howton's stated intent to get Sim "locked away" and keep him in jail despite this lack of probable cause is further evidence of malice.

485.    Sim was damaged by the prosecution.

486.    Specifically, Sim was forced to resign from his job at NASA and suffered severe reputational harm and emotional distress as a result of the commencement and continuation of the criminal prosecution.

487.    An invalid warrant that results in an unlawful arrest suffices to satisfy the Fourth Amendment seizure element of a malicious prosecution.

488.    Because there was no probable cause for the initial warrant procured against Sim by Howton and Koryciak's misconduct, the warrant was invalid, and Sim's arrest was unlawful.

489.    The elements of a malicious prosecution claim were clearly established by the Fifth Circuit at the time of the improper commencement and continuation of the criminal proceeding against Sim.

490.    As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION
### AGAINST HOWTON AND KORYCIAK

**(42 U.S.C. § 1983 – Fourteenth Amendment Substantive Due Process)**

491.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

492.    A substantive due process violation occurs when police intentionally fabricate evidence and successfully procure false charges against an individual for a felony.

493.    As detailed above, Howton intentionally fabricated probable cause affidavits and successfully procured false charges against Sim for sexual assault culminating in Sim's false arrest.

494.    The elements of a false arrest claim based on an invalid warrant were clearly established by the Fifth Circuit at the time of Sim's arrest.

495.    As detailed above, Howton and Koryciak commenced and continued a malicious prosecution against Sim.

496.    The elements of a malicious prosecution claim were clearly established by the Fifth Circuit at the time of the improper commencement and continuation of the criminal proceeding

against Sim.

497.    As detailed above, the actions taken by Howton and Koryciak to falsely arrest Sim and to commence and continue a malicious prosecution against Sim constituted conscious shocking behavior.

498.    As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FOURTH CAUSE OF ACTION
AGAINST THE CITY OF HOUSTON**

**(42 U.S.C. § 1983 / *Monell* – Fourth Amendment False Arrest)**

499.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

500.    On February 29, 2024, the City of Houston (*via* the Houston Police Department) willfully detained Sim without his consent by effecting an arrest.

501.    The City of Houston (*via* the Houston Police Department) detained Sim without authority of law.

502.    The City of Houston (*via* the Houston Police Department) relied on false testimony provided by Cho and Espitia to obtain the warrant for Sim's arrest.

503.    However, as detailed above, the information provided by Cho and Espitia did not establish that there was probable cause to arrest Sim.

504.    Thus, a reasonable officer would not have believed that a crime had been committed based upon an objective review of the evidence available to City of Houston (*via* the Houston Police Department) at the time of Sim's arrest.

505.    Accordingly, Sim was subjected to a false arrest on February 29, 2024 in violation of the Fourth Amendment of the United States Constitution.

506.    As detailed above, the City of Houston (*via* the Houston Police Department) engaged in widespread practices related to the preparation of false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department that were so common and well-settled as to constitute a custom that fairly represents municipal policy.

507.    As detailed above, the City of Houston was aware of structural deficiencies within the Houston Police Department that would lead to constitutional violations, including those that Plaintiff was subjected to.

508.    As a result, the City of Houston was deliberately indifferent to the known or obvious fact that specific constitutional violations would follow from the practices of preparing false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department.

509.    As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>
<u>AGAINST THE CITY OF HOUSTON</u>

**(42 U.S.C. § 1983 / *Monell* – Fourth Amendment Malicious Prosecution)**

510.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

511.    A cause of action for malicious prosecution against a state actor occurs upon (1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendants against the plaintiff who was the defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; (6) damages; and (7) an unlawful Fourth Amendment seizure.

512.    A criminal proceeding was commenced against Sim by the Harris County District

Attorney's Office.

513.    Following its commencement, the criminal proceeding continued against Sim.

514.    The City of Houston (*via* the Houston Police Department) was responsible for commencing and continuing the criminal proceeding against Sim because it made, influenced, and participated in the decision to prosecute Sim.

515.    Specifically, the City of Houston (*via* the Houston Police Department) lied to and misled the Harris County District Attorney's Office and failed to disclose exculpatory evidence to the Harris County District Attorney's Office.

516.    The City of Houston's (*via* the Houston Police Department) misconduct caused the Harris County District Attorney's Office's decision to commence and continue the criminal proceeding against Sim.

517.    The criminal proceeding terminated in Sim's favor when all charges were dismissed on February 25, 2025.

518.    There was a lack of probable cause for the commencement and continuation of the criminal proceeding against Sim.

519.    During the commencement and continuation of the criminal proceeding against Sim, the City of Houston (*via* the Houston Police Department) created testimony for witnesses, ignored evidence indicating that the sexual acts in question were consensual, and otherwise misrepresented witness testimony to the Harris County District Attorney.

520.    A reasonable officer would not have believed that a crime had been committed based upon an objective review of the evidence available to the City of Houston (*via* the Houston Police Department) at the time of the commencement and continuation of the criminal proceeding against Sim.

521.    Because there was no probable cause, the City of Houston (*via* the Houston Police Department) acted with malice in commencing and continuing the criminal proceeding against Sim.

522.    Sim was damaged by the prosecution.

523.    Specifically, Sim was forced to resign from his job at NASA and suffered severe reputational harm and emotional distress as a result of the commencement and continuation of the criminal prosecution.

524.    An invalid warrant that results in an unlawful arrest suffices to satisfy the Fourth Amendment seizure element of a malicious prosecution.

525.    Because there was no probable cause for the initial warrant procured against Sim by the City of Houston's (*via* the Houston Police Department) misconduct, the warrant was invalid Sim's arrest was unlawful.

526.    As detailed above, the City of Houston (*via* the Houston Police Department) engaged in widespread practices related to the preparation of false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department that were so common and well-settled as to constitute a custom that fairly represents municipal policy.

527.    As detailed above, the City of Houston was aware of structural deficiencies within the Houston Police Department that would lead to constitutional violations, including those that Plaintiff was subjected to.

528.    As a result, the City of Houston was deliberately indifferent to the known or obvious fact that specific constitutional violations would follow from the practices of preparing false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department.

529.     As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST THE CITY OF HOUSTON

### (42 U.S.C. § 1983 / *Monell* – Fourteenth Amendment Substantive Due Process)

530.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

531.     A substantive due process violation occurs when police intentionally fabricate evidence and successfully procure false charges against an individual for a felony.

532.     As detailed above, the City of Houston (*via* the Houston Police Department) intentionally fabricated probable cause affidavits and successfully procured false charges against Sim for sexual assault.

533.     As detailed above, the City of Houston (*via* the Houston Police Department) commenced and continued a malicious prosecution against Sim.

534.     As detailed above, the actions taken by the City of Houston (*via* the Houston Police Department) to falsely arrest Sim and to commence and continue a malicious prosecution against Sim constituted conscious shocking behavior.

535.     As detailed above, the City of Houston (*via* the Houston Police Department) engaged in widespread practices related to the preparation of false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department that were so common and well-settled as to constitute a custom that fairly represents municipal policy.

536.     As detailed above, the City of Houston was aware of structural deficiencies within the Houston Police Department that would lead to constitutional violations, including those that Plaintiff was subjected to.

537.　　As a result, the City of Houston was deliberately indifferent to the known or obvious fact that specific constitutional violations would follow from the practices of preparing false probable cause affidavits and effecting illegal arrests by officers in the Houston Police Department.

538.　　As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST CHO, ESPITIA, AND MOREY

### (Malicious Prosecution)

539.　　Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

540.　　Malicious prosecution occurs when (1) a criminal prosecution was commenced against the plaintiff; (2) the prosecution was initiated or procured by the defendant; (3) the prosecution terminated in favor of the plaintiff; (4) the plaintiff was innocent; (5) the defendant lacked probable cause to instigate the prosecution; (6) the defendant acted with malice in bringing about the prosecution; and (7) the plaintiff suffered damages as a result of the prosecution.

541.　　A criminal prosecution was commenced against Sim.

542.　　A person procures a criminal prosecution if her actions are enough to cause the prosecution, and but for her actions, the prosecution would not have occurred.

543.　　A person procures a criminal prosecution despite the fact that the decision to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, when the person provides information which she knows is false.

544.　　Cho procured the prosecution against Sim by providing the City of Houston (*via* the Houston Police Department), Howton, and Koryciak with false information regarding the

nature of her sexual relationship with Sim.

545.    The sexual relationship between Sim and Cho was consensual.

546.    Cho knew that her sexual relationship with Sim was consensual.

547.    Cho falsely told the City of Houston (*via* the Houston Police Department), Howton, and Koryciak that Sim sexually assaulted her despite knowing that all of her sexual encounters with Sim were consensual.

548.    Espitia procured the prosecution against Sim by providing the City of Houston (*via* the Houston Police Department), Howton, and Koryciak with false information regarding the nature of her sexual relationship with Sim.

549.    The sexual relationship between Sim and Espitia was consensual.

550.    Espitia knew that her sexual relationship with Sim was consensual.

551.    Espitia falsely told the City of Houston (*via* the Houston Police Department), Howton, and Koryciak that Sim sexually assaulted her despite knowing that all of her sexual encounters with Sim were consensual

552.    Morey procured the prosecution against Sim by providing the City of Houston (*via* the Houston Police Department), Howton, and Koryciak with false information regarding the nature of her sexual relationship with Sim.

553.    The sexual relationship between Sim and Morey was consensual.

554.    Morey knew that her sexual relationship with Sim was consensual.

555.    Morey falsely told the City of Houston (*via* the Houston Police Department), Howton, and Koryciak that Sim sexually assaulted her despite knowing that all of her sexual encounters with Sim were consensual

556.    The criminal prosecution terminated in Sim's favor when all charges were

dismissed on February 25, 2025.

557. Sim was innocent, as every sexual encounter he had with Cho, Espitia, and Morey was consensual.

558. Because Cho, Espitia, and Morey knew that their sexual encounters with Sim were consensual, Cho, Espitia, and Morey lacked probable cause to instigate the criminal prosecution against Sim.

559. Due to this lack of probable cause, Cho, Espitia, and Morey acted with malice in bringing about the criminal prosecution against Sim.

560. Cho, Espitia, and Morey's malice was also born out of their inability to accept the statuses and ends of their respective relationships with Sim.

561. Sim was damaged by the prosecution.

562. Specifically, Sim was forced to resign from his job at NASA and suffered severe reputational harm and emotional distress as a result of the criminal prosecution.

563. As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### AGAINST CHO, ESPITIA, MOREY, AND CAMPBELL

**(Civil Conspiracy)**

564. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

565. Cho, Espitia, Morey, and Campbell acted in combination for the common purpose of procuring the malicious criminal prosecution of Sim.

566. In furtherance of their plan, Cho, Espitia, Morey, and Campbell made false statements to the City of Houston (*via* the Houston Police Department), Howton, and Koryciak

asserting that Sim engaged in sexual assault.

567.     As of result of their actions, Sim was subjected to a false arrest and a malicious prosecution.

568.     Sim suffered damages as a result of the actions taken by Cho, Espitia, Morey, and Campbell.

569.     Specifically, Sim was forced to resign from his job at NASA and suffered severe reputational harm and emotional distress as a result of the criminal prosecution.

570.     As a result of the foregoing, Sim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     on the first cause of action for violation of the Fourth Amendment of the Constitution of the United States (false arrest), a judgment against Defendants Howton and Koryciak awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, loss of future career prospects, and punitive damages plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for violation of the Fourth Amendment of the Constitution of the United States (malicious prosecution), a judgment against Defendants Howton and Koryciak awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, loss of future career prospects, and punitive damages plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   on the third cause of action for violation of the Fourteenth Amendment of the Constitution of the United States (substantive due process), a judgment against Defendants Howton and Koryciak awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, loss of future career prospects, and punitive damages plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for violation of the Fourth Amendment of the Constitution of the United States (false arrest), a judgment against Defendant the City of Houston awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for violation of the Fourth Amendment of the Constitution of the United States (malicious prosecution), a judgment against Defendant the City of Houston awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for violation of the Fourteenth Amendment of the Constitution of the United States (substantive due process), a judgment against Defendant the City of Houston awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action for malicious prosecution, a judgment against Defendants Cho, Espitia, and Morey awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, loss of educational opportunities, loss of future career prospects, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)    on the eighth cause of action for civil conspiracy, a judgment against Defendants Cho, Espitia, Morey, and Campbell awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, emotional distress, past and future economic losses, loss of educational opportunities, loss of future career prospects, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(ix)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Dated: February 25, 2026

**NELSON S. EBAUGH, P.C.**

/s/ *Nelson S. Ebaugh*
Nelson S. Ebaugh, Esq.
Nelson S. Ebaugh, P.C.
3730 Kirby Drive, Suite 1200,
Houston, TX 77098
Tel: (713) 752-0700
Fax: (713) 739-0500
nebaugh@ebaughlaw.com

-and-

**OFFIT KURMAN, P.A.**

/s/ *Kimberly C. Lau*
Kimberly C. Lau, Esq.
(*pro hac vice* forthcoming)
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, New York 10022
Tel: (212) 545-1900
Fax: (212) 545-1656
kimberly.lau@offitkurman.com

/s/ *James E. Figliozzi*
James E. Figliozzi, Esq.
(*pro hac vice* forthcoming)
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, New York 10022
Tel: (212) 545-1900
Fax: (212) 545-1656
james.figliozzi@offitkurman.com

4902-7567-2204, v. 8